IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MAI MOUA,

         Plaintiff,                  No. CIV S-07-2024 GGH

    vs.

MICHAEL J. ASTRUE,          <u>ORDER</u>
Commissioner of
Social Security,

         Defendant.

_____/

         Plaintiff seeks judicial review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her application for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act"). For the reasons that follow, plaintiff's

Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary

Judgment is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

<u>BACKGROUND</u>

         Plaintiff, born April 12, 1961, applied on May 16, 2005 for disability benefits.

(Tr. at 71.) Plaintiff alleged she was unable to work due to chronic headaches, stomach ulcer,

depression, post traumatic stress disorder ("PTSD"), and anxiety. (Tr. at 46.)

\\\\\

In a decision dated April 5, 2007, ALJ Robert Tronvig, Jr. determined plaintiff was not disabled. The ALJ made the following findings:[1]

1.    The claimant has not engaged in substantial gainful activity since December 10, 2004, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

2.    The claimant has the following severe combination of impairments: chronic back and left shoulder strain, mild degenerative joint disease of the left wrist, depression, posttraumatic stress disorder, GERD, and mild asthma (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

2

functional capacity to work with lifting and carrying 10 pounds frequently and 20 pounds occasionally, standing and walking six hours in an eight-hour day, sitting six hours in an eight-stand hour day, with a sit-stand option, no climbing of ladders, ropes, and scaffolds, occasional balancing, stooping, kneeling, crouching and crawling; and occasional manipulative limitations; avoid concentrated exposures to hazards and fumes, and simple and some detailed tasks with limited social contact.

5. The claimant has past relevant work as a caregiver (20 CFR 416.965).

6. The claimant was born on April 12, 1961 and is 45 years old, which is defined as a younger individual age 45-49 (20 CFR 416.963).

7. The claimant is illiterate and is not able to communicate in English (20 CFR 416.964.)

8. Transferability of job skills is not an issue (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 25, 2005, the date the application was filed (20 CFR 416.920(g)).

(Tr. at 17-24.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Make Adequate Findings Regarding the Nature and Severity of Plaintiff's Mental Impairments; B. Whether Substantial Evidence Does Not Support the ALJ's Findings That Plaintiff's Allegations of Subjective Complaints and Limitations Were Not Credible; C. Whether Substantial Evidence Does Not Support the ALJ's Findings that Plaintiff has the Residual Functional Capacity to Perform Light Work and Work Described by the Vocational Expert; D. Whether the ALJ Failed to Provide Specific and Legitimate Reasons to Reject the Treating Psychiatrist's Assessment of

1  Functional Capacity; and E.  Whether the Vocational Expert's Testimony Fails to Constitute

2  Substantial Evidence that Plaintiff Can Work as a Sorter of Agricultural Products, Assembler at a

3  Bench, and Sewing Machine Operator.

4  LEGAL STANDARDS

5          The court reviews the Commissioner's decision to determine whether (1) it is

6  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

7  the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

8  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

9  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

10 as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

11 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

12 is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

13 ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

14 "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

15 rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

16 ANALYSIS

17     A.  Whether the ALJ Failed to Make Adequate Findings Regarding the Nature and

18 Severity of Plaintiff's Mental Impairments

19          Plaintiff makes several allegations in this section, including that the ALJ failed to

20 mention certain medical notations, such as Dr. Azevedo's statement that plaintiff was

21 cooperative during the examination, her responses were open and spontaneous, her psychomotor

22 activity was highly retarded, and she had a blunted affect and limited range of emotions.

23          Although the ALJ is not required to discuss every piece of evidence, the record

24 does need to demonstrate that he considered all of the evidence.  Clifton v. Chater, 79 F.3d 1007,

25 1009-10 (10th Cir. 1996) (finding ALJ's summary conclusion that appellant's impairments did

26 not meet or equal any Listed Impairment was a bare conclusion beyond meaningful judicial

review).  Furthermore, an ALJ may properly rely upon only selected portions of a medical opinion while rejecting other parts.  See, e.g., Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ's supported reliance on selected portions of conflicting opinion constitutes substantial evidence).  However, such selective reliance must be consistent with the medical record as a whole.  See, e.g., Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001) (ALJ cannot reject portion of medical report that is clearly reliable).

Here, the ALJ described Dr. Azevedo's assessment of July 13, 2005.  At the exam, plaintiff appeared lethargic and had little motivation to do the requested tasks.  She stated, "I don't know" in response to most questions.  Results of cognitive testing were poor; however, this psychologist "noted that her interaction with the interpreter was inconsistent with the test results and suggested that [] her cognitive functioning was underestimated in the testing."  When talking with the interpreter, plaintiff's concentration was fair, and she demonstrated a more thorough comprehension and expressive responses, but during the testing her concentration was poor.  (Tr. at 20.)  Dr. Azevedo diagnosed depressive disorder NOS, rule out posttraumatic stress disorder, and rule out neurocognitive disorder NOS.  Dr. Azevedo concluded that plaintiff could do simple one-step instructions.  (Id. at 20-21.)

Turning to the actual report, it is true that the ALJ did not mention Dr. Azevedo's notation that plaintiff was cooperative during the exam and her responses were open and spontaneous.  This characterization of plaintiff's demeanor and efforts was not necessary to mention, especially after it was followed by the psychologist's aforementioned caveat, as well as the added statement, not mentioned by the ALJ, that "it is unclear whether her apparent apathy was related to her general lethargy, cognitive deficits, or a conscious presentation of exaggerated impairment.  Her conversational skills with the interpreter appeared to far exceed her cognitive functioning test scores, suggesting that the latter m[a]y underestimate her full cognitive potential."  (Id. at 155.)  This advisement in the report places in context the other statements pointed out by plaintiff as being omitted from the ALJ's discussion and serves to minimize them.

1    It is true that Dr. Azevedo also stated he would have liked additional information

2 to understand the extent of plaintiff's difficulties, but plaintiff fails to mention that immediately

3 preceding this statement, he explained why such information was required: "[u]nfortunately, I

4 have no records from her psychiatrist or primary care physician to *corroborate* her reports and

5 clarify her symptoms presentation." (Id. at 157.) (emphasis added).   Similarly, the fact that the

6 ALJ did not mention Dr. Azevedo's statement that plaintiff's concentration, persistence and pace

7 were poor, can be explained by the psychologist's earlier statement that plaintiff's concentration

8 was fair when she spoke with the interpreter, but during testing her concentration was poor,

9 causing Dr. Azevedo to wonder whether plaintiff was exhibiting her full cognitive potential.  The

10 ALJ was not required to discuss these additional statements where the portions of the record he

11 did discuss served to properly characterize this report.

12    What plaintiff fails to mention is the remainder of plaintiff's mental status exam

13 which indicated that she was alert and oriented, had normal speech rate and communicated

14 effectively with the interpreter; her receptive language skills were normal; her reality testing was

15 normal.  There was no formal thought disturbance.  Although plaintiff's insight and judgment

16 appeared to be quite impaired, her comprehension and expressive responses when

17 communicating with the interpreter reflected adequate understanding.  (Id. at 155.)

18    Plaintiff makes similar contentions in regard to records from Butte County

19 Department of Behavioral Health and plaintiff's treating doctor there, Dr. Heitzman.  These

20 records were summarized by the ALJ and included the findings that plaintiff had below average

21 intelligence, poor judgment and insight, and poor short and long term memory, but the remainder

22 of the June 30, 2005 exam was normal.  Plaintiff was diagnosed with major depression without

23 psychosis and PTSD, with a GAF of 40.[2]  The ALJ summed up this report with the notation that

24

25       [2] GAF is a scale reflecting the "psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
26 Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, A GAF of 31-40 indicates:

1  Dr. Heitzman prescribed Seroquel, Cymbalta, Prozac, Ambient, and Tenex, and plaintiff was

2  compliant and showed gradual improvement in symptoms.  Plaintiff was still sad, but she

3  admitted that the medications helped.  (Id. at 21.)

4          Later in the decision, the ALJ discounted Dr. Heitzman's opinion as imposing

5  extreme limitations which were not supported by his own treating records.[3]  By way of example,

6  the ALJ discussed his mental assessment, dated October 13, 2005, wherein Dr. Heitzman rated

7  plaintiff poor in all but two areas.   The ALJ explained, however, that the treating notes indicated

8  gradual improvement in mood once plaintiff started medication and therapy sessions.  (Id. at 23.)

9  Dr. Heitzman's medical source statement did rate plaintiff poor in all areas except in

10  understanding and remembering very short and simple instructions, and in working without

"Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.)"

[3]  Plaintiff raises as a separate issue in her brief the ALJ's rejection of Dr. Heitzman's mental assessment.  Pl.'s Mot. at 29-32.  That issue is addressed in this section.  The court finds the ALJ's rejection of this report to be supported by specific and legitimate reasons.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester , 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001), except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

1  supervision, where he rated her fair. (Id. at 263-64.) He based these ratings on major depression

2  and PTSD, and added that plaintiff's prognosis was poor. (Id. at 264.) The ALJ rejected this

3  medical source statement as inconsistent with Dr. Heitzman's treating records which indicate that

4  as of October 17, 2006, plaintiff was doing well with her current medications,[4] was sleeping well,

5  and her depression and worrying had decreased. Although plaintiff was continuing to experience

6  "some stress" with her 17 year old daughter, the rest of her family was doing fine. Plaintiff was

7  praised by the examiner for her progress and encouraged to continue to work on decreasing her

8  symptoms of PTSD and depression. It was suggested that plaintiff increase her

9  social/recreational activities and maintain a strong support system. (Id. at 354.)

10         Contrary to plaintiff's assertion, the aforementioned treating records indicate

11  improvement in plaintiff's condition after the May 23, 2006 evaluation referred to by plaintiff

12  which showed severe limitations and a GAF score of 45. (Tr. at 362.) The fact that the ALJ did

13  not discuss each treating record separately but rather summarized them as a group is not error.

14  Although the ALJ is not required to discuss every piece of evidence, the record does need to

15  demonstrate that he considered all of the evidence, and in this case it does. Clifton v. Chater, 79

16  F.3d 1007, 1009-10 (10th Cir. 1996).

17         Interestingly, Dr. Heitzman's medical source statement was dated October 13,

18  2005, three and a half months after plaintiff began mental health treatment, and a full year prior

19  to the improvement shown by the treating records. Moreover, Dr. Heitzman's records are based

20  for the most part on plaintiff's subjective complaints which, as discussed in detail in the

21  credibility section infra, have been seriously questioned by other medical sources. "Historically,

22  the courts have recognized conflicting medical evidence, the absence of regular medical

23  treatment during the alleged period of disability, and the lack of medical support for a doctor's

24

25         [4] A condition which can be controlled or corrected by medication is not disabling. See
   Montijo v. Secretary of HHS, 729 F.2d 599, 600 (9th Cir.1984) (Addison's Disease controlled
   with medications deemed not disabling); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir.1983) (rib
26  condition controlled with antibiotics not considered disabling).

report based substantially on a claimant's subjective complaints as specific, legitimate reasons for disregarding the treating physician's opinion." Flaten, 44 F.3d at 1463-64; Fair v. Bowen, 885 F.2d 597, 604 (9th Cir.1989). "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008), citing Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) (citing Fair V. Bowen, 885 F.2d 597, 605 (9th Cir. 1989)). Furthermore, "the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." Id.

To the extent that plaintiff posits the argument that Dr. Heitzman's October, 2005 report is more consistent with Dr. Azevedo's opinion, and that both opinions should carry more weight than the non-examining report of the state agency physician, that argument has been addressed supra.

On December 4, 2006, the most recent psychological treating notes available, it was noted that plaintiff was sleeping better and her depression was better. She continued to experience some stress due to her husband's verbal abuse. Plaintiff was satisfied with her current medications and was having no side effects. Plaintiff was compliant with her medication, and was scheduled to return in two months. (Id. at 354.)

Earlier records dated July 20, 2006, noted improvement in symptoms. (Id. at 358.) On August 24, 2006, it was noted that although plaintiff was tearful and very sad on some visits, during other visits she was stable and smiled occasionally. (Id. at 357.) At this time, although plaintiff's daughter was sneaking out with her boyfriend and plaintiff's husband was yelling and threatening her, plaintiff was sleeping better and was having less nightmares and anger outbursts. The examiner praised plaintiff's progress, and noted plaintiff's compliance with medication without side effects. (Id.)

This improvement was in contrast to plaintiff's presentation on earlier visits wherein plaintiff was so stressed from her daughter having run away from home that she fell

unconscious and was brought to the emergency room.  (Id. at 360.)  Although plaintiff reported

on April 27, 2006 that she couldn't wait until the day she died, she also stated that medications

were helping, she was sleeping better, and was able to control her anger and her stress.  (Id. at

364.)  Plaintiff improved from sleeping only one hour a night at the intake visit on June 30, 2005,

to two hours a night on October 13, 2005, to sleeping five or six hours a night in December,

2005, to sleeping "good" on October 17, 2006.  (Id. at 387, 378, 375,  354.)   These records

indicate that plaintiff was seen at Butte County Mental Health only once a month over a one and

a half year period.  (Id. at 349-94.)  If plaintiff's condition was as serious as she contends, she

would have been seen more frequently or referred for further mental health treatment where she

could be seen more often.

Plaintiff contends that the ALJ failed to discuss some of the aforementioned

records, including her history of abuse as a child, flashbacks of the war in Laos, and various

reported symptoms such as crying spells.  As cited earlier, an ALJ is not required to discuss every

piece of evidence.  Clifton, 79 F.3d at 1009-10.  Here, the record does demonstrate that he

considered all of the evidence, as he was required to do.  Many of the records cited by plaintiff

are based on her own reporting, and as discussed infra, plaintiff's credibility has been properly

questioned.

Also interesting to note is that Dr. Azevedo did not have the benefit of plaintiff's

medical records during his exam.  Although an opinion on an apparently long-standing mental

problem given after only a one-shot examination, without recourse to the medical records, is not

one which can generally be relied upon, here it appears that Dr. Azevedo's exam was conducted

on July 13, 2005, only two weeks after plaintiff had begun mental health treatment.  (Id. at 153,

389.)  Plaintiff filed her application for benefits on May 16, 2005, one a half months before

plaintiff began mental health treatment.  The court has reviewed medical records prior to May 16,

2005 to determine if plaintiff complained of mental health problems to her family physician.  (Tr.

at 159-85, 231-62.)  It appears that in all of the visits where plaintiff complained of various

physical ailments prior to May 16, 2005, there were no mental health complaints other than a couple of notes of insomnia on February 15 and March 17, 2005.  (Id. at 243, 170.)  Plaintiff also voiced this complaint on June 13 and July 12, 2005, after she filed her disability application, but made no other complaints regarding her mental health.  (Id. at 236, 237.)  Therefore, the fact that Dr. Azevedo did not have any medical records available to him is understandable as plaintiff had just begun creating a mental health record for herself at the time of his exam.

The ALJ, in addition to relying on Dr. Azevedo's report, also relied on the DDS non-examining reports.  Such reliance may constitute substantial evidence "when [non-examining] opinions are supported by other evidence in the record and are consistent with it."  Morgan v. Commissioner, 169 F.3d 595, 600 (9th Cir. 1999).  Here, the ALJ explained that "based on the minimal clinical findings, the conservative treatment, and the claimant's lack of credibility, it is found that the record strongly supports a conclusion that she can perform unskilled light work."  (Id. at 23.)  These reasons constitute substantial evidence for the ALJ's finding of lack of severity of plaintiff's mental impairments.

Plaintiff also objects to the ALJ's evaluation of the "B" criteria regarding her degree of functional limitation.  The ALJ evaluated all four areas of functioning and concluded that plaintiff's mental impairment was severe, but did not meet the listings.  (Id. at 18.)  He found that her activities of daily living were mildly limited, her social functioning was moderately limited, her ability to maintain concentration, persistence, and pace were moderately limited, and there was no episode of decompensation or deterioration of an extended duration.  (Id.)  The ALJ evaluated the "B" criteria correctly as set forth in 20 C.F.R. § 404.920a.  Plaintiff's functioning and the ALJ's discrediting of it is analyzed more fully infra in regard to the credibility assessment.  Plaintiff's claim in her reply that the ALJ disregarded the SSA physician's finding that plaintiff was moderately limited in activities of daily living, is unavailing for the reasons stated in the next section.

\\\\\

Finally, in one sentence at the end of this section, plaintiff states that the ALJ should have found that plaintiff equaled the listing for affective disorder due to her pain in her low back and left wrist along with major depression and anxiety disorders. Plaintiff has not briefed this argument. Therefore, it will not be addressed.

B. Whether Substantial Evidence Fails to Support the ALJ's Findings that Plaintiff's Allegations of Subjective Complaints and Limitations Were Not Credible

Plaintiff contends that her symptomatology are credible based on objective evidence such as x-rays and psychological test results.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Vasquez v. Astrue, 547 F.3d 1101 (9th Cir. 2008); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Bunnell at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to

\\\\\
\\\\\
\\\\\

12

follow a prescribed course of treatment; and (3) daily activities.[5] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Plaintiff is required to show only that her impairment "could reasonably have caused some degree of the symptom." Vasquez, 547 F.3d at 1104, *quoting* Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007, Smolen, 80 F.3d at 1282. Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing, and supported by reference to specific facts in the record. Vasquez, 547 F.3d at 1104-05.

The ALJ found plaintiff to be not entirely credible in regard to her statements concerning her medical symptoms. (Id. at 20-21.) First, he discussed the objective evidence regarding her physical symptoms and found little to support the degree of pain alleged. For example, he noted that a CT scan of her lumbar spine was unremarkable. (Id. at 20.) Although she was found to have a left hemiparesis and status post CVA-TIA, the medical record did not show any further mention of this problem, no further work-up, and no other complaints. (Id.) Next, based on complaints of coughing and allergies, plaintiff underwent a pulmonary function test; however, she gave a very poor effort and the reading was not accurate. The ALJ concluded there were few findings for her complaints. In regard to plaintiff's depression, once she was

---

[5] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

1  diagnosed and prescribed Elavil, the next reference of depression in the record was not until

2  August 1, 2006, almost ten months later.  During her exam with Dr. Azevedo, it was noted that

3  plaintiff responded to most questions with the answer, "I don't know."  The ALJ stated,

> She appeared to have little motivation or interest in performing the
> requested tasks.  The results of the cognitive testing w[ere]
> evaluated as poor, although Dr. Azevedo noted that her interaction
> with the interpreter was inconsistent with the test results and
> suggested that [] her cognitive functioning was underestimated in
> the testing.  The doctor evaluated her ability to concentrate was
> poor through testing; however, her concentration appeared to the
> doctor to be fair during the claimant's conversation with the
> interpreter.  Her comprehension and expressive responses with the
> interpreter were more thorough compared to the responses to the
> examiner.

10  (Id. at 20.)   As previously pointed out in the first section of this discussion, Dr. Azevedo's report

11  states that plaintiff's "effort on testing appeared to be minimal."  (Id. at 155.)  Plaintiff had little

12  motivation or interest in the tasks.  The psychologist stated, "[i]t is unclear whether her apparent

13  apathy was related to her general lethargy, cognitive deficits, or a conscious presentation of

14  exaggerated impairment.  Her conversational skills with the interpreter appeared to far exceed her

15  cognitive functioning test scores, suggesting that the latter m[a]y underestimate her full cognitive

16  potential."  (Id.)  He later repeated that although plaintiff's insight and judgment were quite

17  impaired during testing, she exhibited adequate understanding as reflected by her comprehension

18  and expressive responses to the interpreter.  (Id.)  Dr. Azevedo added, "unfortunately, I have no

19  records from her psychiatrist or primary care physician to *corroborate* her reports and clarify her

20  symptoms presentation."  (Id. at 157.) (emphasis added).

21         In an exam with Dr. Goyal, it was noted that although plaintiff reported numbness

22  in her left foot and back pain, she had no problems in sitting during the exam or lying down and

23  getting up.  Dr. Goyal also reported that despite using a cane, plaintiff could walk without one.

24  Although the exam was within normal limits, when the physician checked plaintiff's range of

25  motion in the lumbar area, she gave a poor effort by making her back stiff and refusing to budge

26  for the examiner.  The diagnosis in part was "back pain, subjective-type rather than objective-

type." There were no objective findings pertaining to plaintiff's left arm numbness. Based on this exam, Dr. Goyal found that plaintiff could stand and walk six hours, sit for an unlimited amount of time, and lift and carry 20 pounds frequently and 50 pounds occasionally, despite plaintiff's claim that she could only walk for ten to twenty minutes. (Id. at 21, 186-90.)

The ALJ noted the lack of objective findings to support many of the alleged impairments including "paralysis" of the left arm, normal x-rays of the back, normal gait, and lack of strength loss, motor dysfunction or sensation loss. The care by plaintiff's treating doctor has been routine and conservative with no record of hospitalizations or physical therapy. (Id. at 21.)

The ALJ also discussed plaintiff's daily activities, which were inconsistent from plaintiff's description of them. She stated that she only sits, rests and sleeps throughout the day; however, the ALJ took note of eight young and school aged children living at home, and a husband who is disabled and presumably cared for by plaintiff. The ALJ questioned the reasonableness of assuming that all eight children and plaintiff's husband are cared for only by the older children. The ALJ also referred to several exams where plaintiff had given a poor effort or was inconsistent. (Id. at 22.)

Plaintiff claims that her complaints are credible based on x-rays showing "hypertrophic posterior spondylolytic change of the inferior aspect of the L5 body and mild degenerative changes of the navicular bone of the left wrist," as well as psychological test results consistent with depressive disorder and resulting findings by Dr. Azevedo that plaintiff would have limitations in interacting with other people at work, and Dr. Heitzman's opinion that she would have severe functioning limitations at work.

In regard to the x-rays, the ALJ satisfactorily explained that these objective studies were essentially unremarkable. (Id. at 20.) The radiology report bears this out. (Id. at 185.) The office visit to the treating doctor following this x-ray resulted in only a diagnosis of "LBP" or low back pain. (Id. at 173.)

The psychological testing and limitations were discussed in the previous section and the ALJ findings in this regard were found to be supported. The lack of credibility described in this section only serves to add support to the ALJ's findings in regard to plaintiff's mental impairment.

Plaintiff also objects to the ALJ's failure to give weight to the third party statement of plaintiff's son who indicated that he did the daily chores while plaintiff sat or lay down. The ALJ did address this and other questionnaires in the file, but noted that other questionnaires indicated that she does household chores, drives and runs errands. See tr. at 96. Therefore, the ALJ concluded that plaintiff had mild limitations in daily activities. (Id. at 18.) Turning to the son's questionnaire, it appears that he is old enough to drive her to the store. (Id. at 105.) As the ALJ pointed out, however, it is hard to believe that this teenage boy takes care of seven other children as well as both parents. Furthermore, the evidence of malingering in the record places a shadow over these questionnaires completed by plaintiff and interested family members.

An ALJ is required to "consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)). Similar to the ALJ's role in evaluating the testimony of a claimant, when evaluating the testimony of a lay witness "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The Ninth Circuit has recently held that the ALJ must properly discuss lay witness testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully

crediting the testimony, could have come to a different disability determination.  Stout v. Commissioner, 454 F.3d 1050, 1053 (9th Cir. July 25, 2006).

Here, the ALJ did not specifically refer to the statement of plaintiff's son, but referred to the activities questionnaires as a group.[6]  He properly disregarded such testimony based on plaintiff's own questionnaire regarding her activities, but moreover based on the lack of objective findings in the record, and the evidence of poor effort and inconsistencies on examinations, with commentary by physicians indicating their suspicions.  The ALJ's reasons in this regard were therefore satisfactory.  Even if the ALJ's analysis is considered deficient because he somehow did not specify plaintiff's son by name in referring to his questionnaire, such an error was harmless as no reasonable ALJ would have come to a different conclusion based on the evidence of malingering in the record.  "Credibility determinations are the province of the ALJ." Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir.1995).  In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the [Commissioner].  See Yuckert v. Bowen, 841 F.2d 303, 307 (9th Cir. 1988); Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982)."  Morgan v. Apfel, 169 F. 3d at 599.  The ALJ properly analyzed the evidence in relation to the appropriate factors required by the Bunnell line of cases.

C.  Residual Functional Capacity

Plaintiff next claims that the ALJ's finding that plaintiff can do unskilled light work is not supported by substantial evidence due to plaintiff's mental limitations.  Social Security Ruling 96-8p sets forth the policy interpretation of the Commissioner for assessing residual functional capacity.  SSR 96-8p.  Residual functional capacity is what a person "can still do despite [the individual's] limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

---

[6] Although the son's statement was not testimony, it was made under penalty of perjury. (Id. at 113.)

1  Plaintiff's first contention is that the ALJ failed to make findings in accordance

2  with Dr. Azevedo's determination that "her reported anxiety and depression may result in

3  barriers in attempts to interact appropriately with supervisors, co-workers, and the general public

4  in a work setting."  In this regard, the ALJ specifically limited plaintiff to light work with various

5  physical limitations not pertinent here, and work which involved "simple and some detailed tasks

6  with limited social contact."  (Id. at 19.)   This assessment is consistent with the opinion of Dr.

7  Azevedo in that the ALJ did require a limitation on social contact.  Furthermore, the ALJ limited

8  plaintiff to unskilled or low semi-skilled work.  (Id. at 24.)  Unskilled jobs ordinarily involve

9  dealing primarily with objects, rather than with data or people, and involve little or no judgment

10  to perform simple duties that can be learned on the job in a short period of time.  SSR 85-15.

11  These limitations are also consistent with the non-examining SSA opinions

12  which found moderate limitations in plaintiff's ability to accept instructions and respond

13  appropriately to criticism from supervisors, and moderate limitations in her ability to interact

14  appropriately with the general public.  (Id. at 208.)  Plaintiff's argument that the ALJ failed to

15  include a separate limitation of "inability to respond appropriately to co-workers and

16  supervisors" is unavailing.

17  Plaintiff claims that the ALJ ignored Dr. Azevedo's statement that plaintiff's

18  concentration, persistence and pace were poor on examination and that she would be impaired in

19  her attempt to manage these tasks in a work setting.  As previously discussed, Dr. Azevedo

20  questioned the sincerity of  plaintiff's efforts throughout his report, and the ALJ was therefore

21  entitled to consider this assessment in the context of the credibility issue.  As plaintiff also

22  pointed out, the state agency physician found plaintiff to be "not significantly limited" in her

23  ability to complete a normal work day and week or to perform at a consistent pace.  (Id. at 208.)

24  \\\\\

25  \\\\\

26  \\\\\

D.  Whether the Vocational Expert's Testimony Fails to Constitute Substantial Evidence that Plaintiff Can Work as a Sorter of Agricultural Products, Assembler at a Bench, and Sewing Machine Operator

Plaintiff contends that of the eight hypotheticals posed to the vocational expert, questions numbered five, six and seven do not constitute substantial evidence that plaintiff could do work as an agricultural products sorter, assembler at a bench, and sewing machine operator because they did not include the correct mental impairment limitation.  Plaintiff contends that only hypothetical number eight contains limitations based on the medical record, and the expert testified that under this hypothetical there were no jobs plaintiff could do.

Hypothetical questions posed to a vocational expert must include all the substantial, supported physical and mental functional limitations of the particular claimant.  Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d 789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the expert's testimony as to available jobs in the national economy has no evidentiary value.  DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d 947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, substantial evidence must support the hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).[7]

\\\\\

---

[7]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial evidence or reject them if they are not.  Id. at 756-757.

The first hypothetical at issue, number five, was based on physical limitations of less than sedentary level, and contained no mental limitations. (Tr. at 429.) It is undisputed that this hypothetical was not utilized by the ALJ in his decision.

The next hypothetical, number six, was the one to which the expert testified that plaintiff could still perform the above mentioned jobs even with some mental limitation, and it was the hypothetical relied on by the ALJ. This hypothetical assumed the same exertional definitions of hypothetical number four: "lift and carry 20 pounds occasionally, 10 pounds frequently; can sit, stand, and walk with normal breaks six out of eight hours with a sit/stand option; push/pull is commensurate with lift/carry; postural, this person is never to do ladders, ropes, and scaffolds, all other posturals are occasional; all manipulative are occasional; there are no visual limitations; ... avoid concentrated exposure to hazards and fumes." (Id. at 427, 19.) It added the mental limitation of mild to moderate difficulties in dealing with the public or supervisors and stated that plaintiff had the ability to remember, understand and carry out detailed instructions. (Id. at 430.) Of the jobs previously identified in response to hypothetical number 4, the expert opined that plaintiff could still do the jobs of agricultural products sorter, assembler at a bench, and sewing machine operator with these mental limitations. (Id.)

Hypothetical number six is supported by the opinions of both Dr. Azevedo and the state agency physician. Dr. Azevedo had opined that although plaintiff appeared to interact appropriately with the interpreter, "her *reported* anxiety and depression *may* result in barriers in attempts to interact appropriately with supervisors, co-workers, and the general public in a work setting." (Id. at 158.) (emphasis added). It bears repeating that Dr. Azevedo questioned plaintiff's credibility in his report. Further, this psychologist did not specify the extent of plaintiff's limitation in social interaction. The non-examining SSA physician found plaintiff to be moderately limited in social interact with the public and supervisors. (Id. at 208.) The ALJ adequately limited plaintiff to mild to moderate difficulty in social interaction based on these reports which constitute substantial evidence. Furthermore, the ALJ limited plaintiff to unskilled

20

or "low semi-skilled work" which does not usually involve interaction with people.  See

discussion *supra* in previous section; SSR 85-15.

With respect to plaintiff's claim that the hypothetical stated that she had the ability

to remember, understand and carry out detailed instructions, where the medical opinions found

her moderately limited in this area, plaintiff is correct that the non-examining state agency

physician so found.  (Id. at 207.)  Dr. Azevedo offered the opinion that plaintiff could

understand, remember, and carry out simple one-step instructions, but "there may be limitations"

beyond this level.  (Id. at 158.)  Any error in this regard was harmless as the jobs identified by the

expert do not require the ability to carry out detailed instructions.  An error which has no effect

on the ultimate decision is harmless.  Curry v. Sullivan, 925 F.2d 1127, 1121 (9th Cir. 1990).

The job of sorter, agricultural produce, has a reasoning level of 1 which is defined as "apply

commonsense understanding to carry out simple one- or two-step instructions.  Deal with

standardized situations with occasional or no variables in or from these situations encountered on

the job."  DICOT 529.687-186.  The job of bench assembler contains a reasoning level of 2,

defined as "apply commonsense understanding to carry out detailed but uninvolved written or

oral instructions. Deal with problems involving a few concrete variables in or from standardized

situations."  DICOT 706.684-042.   The job of sewing machine operator[8] also has a reasoning

level of 2.[9]  DICOT 786.682-042.

Here, the limitation to simple job instructions must be reconciled with the various

reasoning levels of the jobs assigned by a vocational expert.  Rather than adhere to a strict

construction of what this limitation equates to in terms of reasoning level, this court prefers to

follow the well developed reasoning of the Central District in Meissl v. Barnhart, 403 F. Supp.

2d 981, 983 (C.D. Cal. 2005).  There, the plaintiff was found to be limited to "simple tasks

---

[8]  The job title matching this numerical designation is "binder, lockstitch."

[9]  Both the ALJ and the vocational expert assigned this job a reasoning level of 3;
however, the DOT classifies it as level 2.  (Id.)

performed at a routine or repetitive pace." Id. at 982. The court explained that although the

Social Security Regulations contained only two categories of abilities in regard to understanding

and remembering instructions, either "short and simple" and "detailed" or "complex,' the DOT

had many more gradations for measuring this ability, and there were six gradations altogether.

Id. at 984. For example, level 2 requires application of "commonsense understanding to carry

out detailed but uninvolved written or oral instructions. Deal with problems involving a few

concrete variables in or from standardized situations." DICOT, App. C. The court continued:

> To equate the Social Security regulations use of the term "simple"
> with its use in the DOT would necessarily mean that all jobs with a
> reasoning level of two or higher are encapsulated within the
> regulations' use of the word "detail." Such a "blunderbuss"
> approach is not in keeping with the finely calibrated nature in
> which the DOT measures a job's simplicity.

Meissl, 403 F. Supp.2d at 984.

Furthermore, the use of the term "uninvolved" along with the term "detailed" in

the DOT qualifies it and refutes any attempt to equate the Social Security regulations' use of the

term "detailed" with the DOT's use of that term. Id. The court found that the plaintiff's RFC

must be compared with the DOT's reasoning scale. A reasoning level of one requires slightly

less than simple tasks that are in some sense repetitive. For example, they include the job of

counting cows as they come off a truck. A reasoning level of two would encompass an RFC of

being able to do "simple and routine work tasks." Id.

The reasoning levels of the jobs which the vocational expert testified that plaintiff

could do are not in conflict with the limitation to simple job instructions as described by Dr.

Azevedo and the state agency doctor.[10] Therefore, the hypothetical posed to the expert and relied

---

[10] Plaintiff also contends that hypothetical number seven also did not include the proper limitations; however, the ALJ did not use that hypothetical in his analysis. (Id. at 430, 19.) Plaintiff contends that this hypothetical imposed moderate to marked limitations in social functioning and resulted in an expert opinion that there were no jobs plaintiff could do. This argument is unavailing since no medical source found that plaintiff had severe limitations in this

upon by the ALJ properly reflected plaintiff's limitations and is based on substantial evidence.

CONCLUSION

Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is denied, the Commissioner's Cross Motion for Summary Judgment is granted, and judgment is entered for the Commissioner.

DATED: 04/14/09                    /s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Moua2024.ss.wpd

regard, and hypothetical number six encompassed the finding of moderate difficulties as opined by the medical sources.